(No. 43622.—
(No. 43832.—

THE PEOPLE *ex rel.* GERALD DANIEL WALKER, Appellant, v. FRANK J. PATE, Warden, Appellee.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GERALD DANIEL WALKER, Appellant.

*Opinion filed January 26, 1973.*

GERALD DANIEL WALKER, *pro se,* appellant.

WILLIAM J. SCOTT, Attorney General, of Spring-field, and LOUIS R. BERTANI, State's Attorney, of Joliet (JAMES B. ZAGEL, Assistant Attorney General, and LUDWIG J. KUHAR, Assistant State's Attorney, of counsel), for the People.

VESCELUS, LEETZ, PERRY & POLLARD, of Wheaton, appointed by the court, for appellant.

WILLIAM J. SCOTT, Attorney General, of Spring-field, and JACK HOOGASIAN, State's Attorney, of Waukegan (JAMES B. ZAGEL, Assistant Attorney General, and WILLIAM D. BLOCK and DUDLEY E. OWENS, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE WARD delivered the opinion of the court:

A jury in the circuit court of Lake County found Gerald Daniel Walker, the defendant, guilty of attempted murder and aggravated battery. He was sentenced to concurrent terms in the penitentiary of 16-20 years for attempted murder and 8-10 years for aggravated battery. He appealed directly to this court from the convictions.

Contrary to the repeated advice of the trial judge that he be represented by counsel, the defendant chose to represent himself at trial. The court did appoint an attorney to provide advice to the defendant when request-ed. On this appeal, too, the defendant appears *pro se,* and has submitted a 100-page brief alleging numerous errors in

the conduct of his trial. Another brief has also been filed by counsel who was appointed to assist the defendant in the presentation of his appeal.

We begin our discussion of this appeal by observing that the defendant correctly contends that it was error to impose a sentence for aggravated battery as well as a sentence for attempted murder, since both crimes resulted from the same conduct and because aggravated battery is a lesser included offense of attempted murder. The State acknowledges the validity of the defendant's position. *People v. Peery, 81 Ill. App. 2d 372, 377;* see also *People v. Schlenger, 13 Ill. 2d 63, 66-67.*

The principal witness for the People was Sven G.S. Lundgren, a State trooper, who was shot by the defendant. On May 26, 1969, he was on duty in a patrol car on U.S. 12 in the vicinity of Volo. About 9:20 A.M. he noticed a 1968 Chevrolet auto without a front license plate. At his signal the driver of the Chevrolet, the defendant, pulled to the side of the road. The defendant told the officer that he had lost the plate the week before, and that he had leased the auto, but did not have the lease papers with him. The officer was standing next to the Chevrolet, and he and the defendant, who was from Wisconsin, engaged in conversation regarding the officer's plans to open a business in Wisconsin. At that, the defendant gave the witness his business card. The officer had informed the defendant that he would have to "check the car out," and on the back of the defendant's business card he noted the vehicle's identification number from the dashboard.

The defendant and the witness then moved to the patrol car, with the defendant sitting on the passenger's side of the front seat and the officer on the driver's side. When the witness again told the defendant that he was going to "call the [license plate and vehicle identification] numbers in to check on the car," and that it would then take ten or fifteen minutes to make the check, the defendant left the police car to get a magazine from his car.

Trooper Lundgren radioed the information and began to fill out a warning ticket. As he did, he observed the defendant returning from his car with a magazine under his arm. He noticed the defendant open the passenger door of the police car as he continued to fill out the ticket. Seconds later he heard a shot and experienced "something *** crashing into the side of [his] head." He said he fell to his right, realized he had been shot and lost consciousness. He did not at any time see a weapon. About five minutes later, he learned, he regained consciousness, saw he was alone and then radioed that he had been shot.

Other testimony introduced by the People showed that the bullet had entered under the witness' right ear and lodged in the skin just under the left ear lobe, the path of the bullet being approximately parallel to the ground. There was also testimony that an advertising magazine and the defendant's business card, which he had given Lundgren, were found in the police car. A police ballistics expert, who conducted tests on the bullet which was removed from the victim, testified that in his opinion the bullet had been fired from the .25 caliber automatic pistol which was found on the defendant when he was arrested two weeks later. The defendant was arrested in a woods in Chicago, after a high-speed chase that included police use of a helicopter. It was shown that the vehicle the defendant was driving when he was stopped by Trooper Lundgren belonged to Charles Richards, a resident of Des Plaines, Illinois, and that it had been stolen from a garage in Des Plaines a few weeks before the shooting.

The defendant, who took the stand, did not explicitly deny that he had been driving the stolen car. Rather, he simply referred to other evidence which, in the moments following the shooting, described the car driven by Lundgren's assailant as blue rather than gold, as Richards had described his auto. Prior to trial, the defendant filed an affidavit of intention to rely on an alibi defense, but his defense at trial was that the officer had been wounded when the defendant's weapon accidentally discharged. The

defendant testified that he was carrying the .25 caliber pistol in his right rear pocket with a round in the chamber, but he said that the weapon was uncocked. He could not, however, recollect, he testified, whether the safety had been engaged. He said that when he returned to the patrol car carrying the magazine, he fell backwards to the ground. The weapon then struck the ground, and discharged. The bullet first struck him on the right thigh, and then, after ricocheting off an unknown surface wounded the officer.

He testified that he was not conscious of what had happened until he left the scene. At first, he stated, he felt only a sharp pain and thought that a sniper in the nearby fields had shot the officer and him.

To support his version of what occurred, the defendant had several persons who had visited him in the Lake County jail three of four weeks after the shooting incident testify. They testified that the defendant had exhibited his right thigh, and that they had observed a "scab" there. The testimony of the witnesses varied in estimating the "scab's" size.

Also giving testimony for the defendant was a weapons expert who had been appointed by the court after the defendant had made a motion seeking such expert assistance. The witness testified that he had examined the defendant's pistol and that he was of the opinion that a sharp striking of the weapon against a hard surface might cause it to discharge as the defendant had claimed it had.

The first contention the defendant makes here is that the trial court erred in denying his motion for a new trial. In support of his motion, the defendant had submitted several affidavits, and he argues here that what they set out established his right to a new trial within our holdings, including *People v. Baker, 16 Ill.2d 364.* In *Baker* this court discussed criteria to be considered upon a motion for a new trial on the ground of newly discovered evidence. It was observed: "A motion for a new trial on the ground of

newly discovered evidence is addressed to the discretion of the trial judge and denial thereof will not be disturbed upon review in the absence of a showing of an abuse of discretion. [Citation.] To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. [Citations.]" 16 Ill.2d at 373-374.

The principal claims by the defendant of "newly discovered evidence" were based on an affidavit of Charles W. Wilson, a forensic expert retained by the defendant after his conviction. Wilson's affidavit described his analyses of several items given him by the defendant. Having examined under a magnifying glass the .25 caliber bullet that struck Officer Lundgren, it was Wilson's opinion that the bullet had struck two hard surfaces before wounding the officer. An inspection of a photograph of Lundgren's patrol car, moreover, according to Wilson, revealed a "nick or disfigurement in the forward portion of the right door *** that could be consistent with its having been struck by a projectile such as the bullet." In his opinion also, if the hammer of the pistol had struck a hard object when there was a shell in its chamber, the gun could fire, regardless of the position of the safety lever and whether or not the weapon were cocked.

Wilson also reported an examination by him of certain black particles given him by the defendant in a sealed envelope. He was of the opinion that the particles were "the products of fired smokeless gunpowder." He also said he examined the defendant's claimed wound under a magnifying instrument and noticed "foreign particles under the skin in a t-shaped pattern or arrangement that would be expected from the muzzle blast ***." Based on these observations and on his general observation of the

wound, he was of the opinion that the wound was the product "of a gunshot injury, where the weapon was virtually in contact with the skin at the time the shot was fired."

That the defendant's wound may have been caused by a muzzle blast was also expressed in an affidavit prepared after trial by Dr. Harold Wagner, a pathologist and the coroner of Kenosha, Wisconsin. In it he stated that he had examined the defendant in his cell November 28, 1969, at the request of Charles M. Wilson and had found that the wound area contained tan-brown pigmentation "consistent with the pigmentation found following heat of an approximate gun blast." Dr. Wagner had attempted to remove some of the pigment for study, but had been unsuccessful.

We judge that the trial court did not err in denying a new trial on the basis of newly discovered evidence. In *People v. Holtzman, 1 Ill.2d 562, 569,* it was observed: "Applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts, and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, as a last resort, to escape the consequence of an adverse verdict, such application should always be subjected to the closest scrutiny by the court, and the burden is upon the applicant to rebut the presumption that the verdict is correct and to show there has been no lack of diligence. The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in case of manifest abuse." The defendant in *People v. Dukes, 19 Ill.2d 532,* sought a new trial on the basis of newly discovered evidence, which consisted of a post-trial analysis and report by a forensic expert of the markings on certain bullets which had been found near the scene of the crime involved. In holding that there was no abuse of discretion in the refusal of the trial judge to allow the motion, this court said at page 538: "We are of the opinion that the ruling of the trial judge on this motion

was correct. Applications for new trials on the ground of newly discovered evidence are not regarded with favor and must be closely scrutinized. In order to justify a new trial the newly discovered testimony must be conclusive and not merely cumulative, and the evidence must appear to be of such conclusive character that it will probably change the result if a new trial is granted. [Citations.] " Here there was no showing where the particles given Wilson by the defendant came from and, therefore, their relevance to the facts in this case was not shown. The opinion evidence tendered was not conclusive, and since the defendant did present expert testimony at the trial that the shooting could have occurred in the manner the defendant claimed it did, it was to be viewed as cumulative evidence. Considering all of the circumstances in evidence at the trial, the trial court could have properly considered that it was not of such conclusive character as would have changed the result of the trial had a new trial been granted.

The defendant complains that his failure to secure this expert assistance before or during trial was because the trial court denied his motion requesting expert assistance. He urges that this was reversible error. In *People v. Watson, 36 Ill.2d 228,* upon which the defendant principally relies, we held that the trial court erred in not allowing an indigent-accused public funds with which to hire a documents examiner. We said that the issue of handwriting in that case, where forgery was charged, went "to the heart of the defense."

We consider that the People are correct in their response that there was no improper denial of expert assistance to the defendant. The record shows that the defendant made a motion on August 18, 1969, to have the court appoint Edward Pasko, a Lake County deputy sheriff, as a special investigator for the defendant in the preparation of his defense. Specifically, he informed the court that he wished Pasko to obtain certain garments which he had allegedly hidden near U.S. 12, one mile

south of Volo; also, to obtain "one spent bullet and surrounding evidence thereof at two certain addresses; and evidence of the defendant's method of possession of one (1) .25 caliber automatic pistol." This motion was denied. On October 27, 1969, the date which had been set for trial, the defendant moved that certain experts be made available to him. The experts he sought were a weapons expert to perform tests on the .25 caliber pistol, and a "licensed medical doctor familiar with gunshot wounds to aid the defendant in examination and offer expert testimony as to the wound or wounds alleged by the People's Witness Sven Lundgren." The motion was allowed as to a weapons expert and denied as to a physician.

We judge that the motions for a physician to consult with the defendant and to offer expert testimony relative to Trooper Lundgren's wound and for the appointment of the deputy sheriff to recover the specified items were not shown to have been sufficiently related to the defendant's theory of defense. We noted in *People v. Watson, 36 Ill.2d 228,* that "There are instances *** where an expert might be necessary to establish a defense." The trial court did not err in denying these motions, whose allowance was not, under the circumstances given by the defendant, necessary to establish a defense. The trial court considered that a weapons expert was important to the defendant's theory of defense. The expert, James Shaw, who consulted with the defendant, did give testimony favorable to the defendant's claims when he answered affirmatively this question asked by the defendant: "Now, in your opinion, with your years of experience, assuming that there was a round in this gun, in this chamber, this hammer was in a totally uncocked position, fully forward, the safety was off, this weapon was in the rear pocket in a manner like this, and the person whose pocket this weapon was in, weighed approximately 200 pounds, and would fall on the weapon, would the weapon fire?"

The record does not support the claim of an unconstitutional denial of expert assistance.

The defendant next contends there was reversible error committed through the failure of the prosecution to comply with a pretrial order that granted the defendant discovery of fingerprints and bloodstains of his that might have been found at the scene of the crime. Before the trial the People stated that no fingerprints of the defendant had been found, that none would be introduced at the trial; and consistent with the representation, no evidence of the defendant's fingerprints was introduced. The record does not show that the People responded to the order relative to any bloodstains of the defendant that might have been found. The defendant argues that the presence of his bloodstains would have supported his version of the shooting of the trooper.

We do not consider that the People's not responding to the order concerning the finding of bloodstains of the defendant was, under the circumstances, error. There was evidence that the officer's wound caused bleeding, and that blood was found in the patrol car. There was no evidence that blood of the defendant had been found, nor was there evidence that there had been any blood analyses made. The defendant did not testify that there were bloodstains of his in the area where the shooting occurred.

Too, there was no evidence that the defendant sought the assistance of a physician. He testified only that he purchased some medicine and bandages after the incident. Immediately after his capture following the chase two weeks after the shooting, the defendant was strip-searched at the police station, and the officers testified that they did not observe any mark or other sign of the wound the defendant claims to have suffered. He was asked at that time if he had any scars, and he said nothing about any wound in his thigh. Nor did he in the months following his arrest seek any medical examination, though he did

request during trial that a physician examine the wound. Considering the circumstances, it cannot be said there was any serious error through the People's not responding to the order as it related to bloodstains of the defendant that might have been found.

Parenthetically, though the reason for the People's omission does not appear, it might have been through an oversight caused by the sheer volume of the defendant's motions. The record shows at least 75 motions made by him in advance of trial, as well as many others made in the course of trial.

The defendant next complains that the prosecution deliberately prevented his wife, Edna Walker, from testifying for him at trial. The defendant, on August 30, 1969, filed a motion asking that he be informed whether the prosecution intended to call Edna Walker as a witness and whether the prosecution had obtained a certificate from the court to secure her attendance as an out-of-State witness. (Ill. Rev. Stat. 1967, ch. 38, par. 156—3.) The motion was denied when the People, who apparently had included the name of the defendant's wife on the list of witnesses furnished the defendant, protested to the court that they did not at that time have to make a final decision or commitment as to whether the wife would be called. When the defendant asked for "*** leave to file with the court a motion for a certificate to call her as a defense witness," he was advised that a motion for a certificate of the court could be made without obtaining leave of court to file the motion. Sometime later the defendant, without moving for a certificate by the court to have his wife called as a witness under section 3 of the Uniform Act to Secure the Attendance of Witnesses (Ill. Rev. Stat. 1967, ch. 38, par. 156—3), had her served with a subpoena ordering her to appear in the circuit court of Lake County on October 27, 1969. In a post-trial affidavit that Mrs. Walker furnished the defendant, she stated that when she received the subpoena on October 24, 1969, she phoned the office

of the State's Attorney of Lake County and was advised that she did not have to appear on October 27, 1969.

On October 27, the defendant asked the court to issue a certificate to summon Mrs. Walker and moved to continue the trial, which was to begin that day. The motion for continuance was denied, and on October 28, 1969, an order was entered granting the defendant's motion for a certificate. The Lake County Board of Supervisors issued a check on October 29, 1969, to cover the witness fees for Mrs. Walker, and on that date the process for the witness was sent to Detroit, Michigan, by special-delivery air-mail. The certificate was received by the Wayne County, Michigan prosecutor's office on the day defendant's trial ended, October 31, 1969.

The defendant declares that "[t]he whole episode surrounding the summoning of defense witness Edna Walker is so fraught with procrastination, intervention and delay as to constitute a flagrant violation of this defendant's constitutional rights." Specifically, it is claimed there has been a violation of the defendant's sixth-amendment right to have process to compel the attendance of witnesses in his behalf.

It is first to be observed that Edna Walker, by the defendant's own statement, would not have been able to give testimony which would have supported the defendant's theory of the shooting. When the defendant requested the court to issue the certificate to summon his wife he represented to the court that his wife could "testify as to [his] exact whereabouts on the day of the alleged crime." That, of course, was not a matter at issue. Under his defense the defendant obviously was present at the scene; his thesis was that the shooting was accidental. His wife concededly was not present at the shooting and would not have been able to have given support to the defendant's claim of an accidental shooting.

We do not find any improper delay of the defendant's proceeding to compel the attendance of the proposed

witness. The certificate and the witness fees were forwarded to Michigan without delay. The defendant did not seek a continuance on October 31 to permit his wife to have an opportunity to testify. The information the State's Attorney's office gave to Mrs. Walker, according to her affidavit, would not have been surprising to the defendant. When he requested the issuance of a certificate on October 27 for his wife's appearance he admitted to the court that at the time the first subpoena for Mrs. Walker was issued he knew it had little or no value. The defendant was made aware on August 30, 1969, that he did not require leave of the court to move for issuance of a certificate, yet he had Mrs. Walker subpoenaed without obtaining a certificate to insure her appearance.

The defendant next contends there was error through the introduction of his prior armed-robbery convictions for purposes of impeachment. Prior to trial, the defendant unsuccessfully moved to enjoin "the State's Attorney from cross-examining or interrogating [him] concerning his prior criminal record," which denial is not now challenged. At trial the defendant himself first called the jury's attention to his earlier convictions when, during his direct examination, he told of them in a narrative summary. He testified that in the early 1950's he had served three years and three months in the Florida state penitentiary for armed robbery, that when he was paroled he immediately began serving a sentence in the Ohio state penitentiary for an earlier armed-robbery conviction. He also said that although his Ohio sentence was for a term of 10-25 years, he was paroled after having served only 5 years and 4 months. He testified that he had been assigned as a teacher and a payroll clerk in the penitentiaries.

On cross-examination the prosecutor, after referring to the defendant's testimony as to his previous convictions, questioned the defendant concerning the number of robberies of which he had been convicted in Florida and Ohio. The defendant's response was that he had been

convicted of five robberies in Florida and five in Ohio. The defendant made no objection to the questioning.

The defendant now claims there was error in the prosecutor's questioning. First, he says there was error through the prosecution's not observing the rule that the introduction of prior convictions to impeach must be by the record or an authenticated copy of the judgment of conviction. The force of the argument is blunted, however, by the fact that it was the defendant who, through his direct testimony, brought out that he had been convicted of robbery in Florida and Ohio. Too, there was no objection whatever to the prosecutor's question, much less a specific objection, as our decisions have required. It was said in *People v. Jennings, 298 Ill. 286, 288;* "*** plaintiff in error's objection *** was general and not upon the ground that the record [for conviction] should be produced to prove the facts, and not having raised the specific objection he must be held to have waived it." See also *People v. McCrimmon, 37 Ill.2d 40, 46-47.*

Alternatively, the defendant argues that under our decision in *People v. Montgomery, 47 Ill.2d 510,* it was error to permit the cross-examination as to the number of convictions. The relevance of *Montgomery* is not apparent, but in any event that decision, handed down after this defendant's trial, was declared by us to be only prospective in application. (*People v. Montgomery, 47 Ill.2d 510, 519.*) Too, the defendant made no objection to the questions on cross-examination and, of course, it was his own testimony on direct examination that brought out the fact of his having been convicted.

Another claim is that the defendant was deprived of a fair trial because certain of his requests for evidence allegedly in the possession of the People were denied.

The first such denial occurred, the defendant says, during his cross-examination of the victim. Before cross-examination the defendant made a request for any written statements that had been made by Trooper Lundgren.

There was no objection to this request, and the People turned over to the defendant prior statements made by the witness. The defendant also requested that he be furnished the trooper's personnel and disciplinary records, and he now says that there was error in not providing him with such records. To support the contention he cites *People v. Allen, 47 Ill.2d 57, 59,* where we said there may be an obligation to furnish an accused police reports and even inter-departmental records. In *Allen,* however, prior to saying this we had explained: "The prosecution on demand is required to furnish an accused for possible impeachment use specific statements in its possession or control which were made by a State's witness, which have been shown to exist and which are in the witness' own words or substantially verbatim. [Citations.]" Also, in *People v. Durso, 40 Ill.2d 242, 250,* we observed that "a defendant is entitled to a previous statement of a witness to be used for impeachment purposes, but the requirement applies only to specific statements which have been established to exist and which are in the witness's own words or substantially verbatim. [Citations.] Also it is essential that a preliminary foundation be laid showing the existence of the statement ***." There was no showing here by the defendant of the existence of any statements of the officer in the personnel records, and the record shows that in opposing the requests of the defendant the prosecutor said expressly that there were no such statements in those records. There is no substance to the defendant's claim of error as to the records.

The second allegedly wrongful denial of the defendant's request for evidence concerned the first page from a warning-ticket book that had been partially filled out by Trooper Lundgren at the time he was shot. Lundgren had testified that he had written the defendant's driver's license number on the page and had noted "Wisconsin" (where the defendant lived) and the county and township. His testimony did not make clear whether he had noted

the county and township of the location where he was preparing the warning ticket or a county and township in Wisconsin. The warning-ticket book was identified by the trooper and introduced into evidence, but the page that the witness had said he had partially completed, in the course of formally warning the defendant for driving with a missing license plate, was missing. The trooper's book was found in the defendant's possession at the time of his arrest and this is not disputed by the defendant. A reference to the missing page of the book may have been made by People's witness, Gary McAlvey, the superintendent of the Illinois Bureau of Criminal Identification and Investigation, who testified concerning tests he had made on the .25 caliber pistol found on the defendant. During the defendant's cross-examination of McAlvey, he inquired as to whether the witness had made a report regarding the matters to which he had just testified, and, when the witness responded that he had, the defendant at his request was furnished with these reports. When McAlvey was asked if there had been any other reports he said vaguely: "I believe there is a report with regard to a photograph of the initial copy found on the citation book there, the ticket book." When the defendant made a request for this report it was denied, following an objection by the prosecution that the witness had not given testimony regarding any report of this character and that it was beyond the scope of the direct examination and irrelevant.

We cannot conclude that there was error in the trial court's ruling. The scope of cross-examination is a matter resting within the sound discretion of the trial court, and its ruling will not be disturbed in the absence of any showing of abuse of discretion. (*People v. Nicholls, 42 Ill.2d 91.*) We would add that there is nothing elsewhere in the record to suggest that the prosecution was ever in possession of the missing first page. The testimony of the witnesses who recovered the ticket book from the defend-

ant's possession and those who testified as to the chain of possession of this evidence was that the book was in the same condition as when it had been found on the defendant. We cannot find any possible prejudice to the defendant through the trial court's denial of a request for an item of possible evidence which was never shown clearly to have been in the People's possession and whose value to the defense was patently dubious at best.

The third denial of which the defendant complains in this argument concerns certain material prepared by Vernon H. Daluge, a crime technician who had examined the area where the shooting occurred. At the beginning of the cross-examination of Daluge the defendant asked to be furnished with the witness's notes and reports of investigation which he had prepared, and this was allowed by the court. But the People then objected to furnishing the defendant with two documents, which the witness apparently had in his possession, the contents of which are not disclosed by the record. The prosecution protested that they were not relevant to the testimony given by the witness. After examining the two documents the court sustained the objection on the ground that they were irrelevant to the testimony which had been given. There was no error in the trial court's examining the documents and, having concluded that they did not relate to the testimony of the witness, in denying the defendant's request. *People v. Wolff, 19 Ill.2d 318, 326-327.*

Another contention of the defendant is that he was denied trial by a fair and impartial jury. The defendant would base this contention upon post-trial affidavits of two of the jurors. The affidavits appear in the abstract filed here by the defendant, but they are not part of the trial court record. Because they are not part of the record the People have moved to strike the contention that it is claimed they support. The People's argument is valid. The purpose of a review is to evaluate the record of the trial court proceeding, and, in general, the review will be

limited to what appears in the record. This was illustrated in *Kazubowski v. Kazubowski, 45 Ill.2d 405, 415,* where it was said in a resembling situation: "This affidavit has never been filed in the trial court and is not part of the record on appeal. It cannot be considered by this court. [Citations.]" Because of the circumstances of this case we would note parenthetically that the contentions founded on these affidavits have no merit.

According to the affidavits, the two jurors stated that Judge Lloyd Van Deusen, when the panel from which the jurors in this case were chosen was assembled, spoke to the prospective jurors. He noted that their jury service would expire in two weeks, and that a case coming up for trial might extend beyond their expected time of service. The judge then, according to one affiant, asked which of them would not mind serving beyond the normal period for their service, and, according to the other affiant, asked for volunteers to serve. There was no identification of the case or any other comment on it by Judge Van Deusen.

The defendant says the conduct of the judge prejudiced him by depriving him of a representative cross-section of the population in the county in which he was tried. We do not judge there is merit to the contention. It is not alleged that any racial, ethnic, religious or other identifiable social group was excluded from Walker's jury, which discrimination has been considered to be improper. (See *Carter v. Jury Com. of Greene County, 396 U.S. 320, 24 L. Ed. 2d 549, 90 S. Ct. 518.*) We will not find prejudice to an accused from what can be considered the court's administrative action to insure the selection of a jury that would give an adequate consideration to issues presented to it, and to insure the avoidance of a temptation to act in haste because its period of normal service had expired.

It is further argued that the conduct of the judge was improper because the defendant had moved for a change of venue and the judge had already removed himself from

the case. However, the disqualification of the judge did not preclude his acting purely in a formal or ministerial manner, as here. (*State v. Compton, 57 N.M. 227, 257 P.2d 915.*) The judge was not performing a judicial act or an act which called for the exercise of judicial discretion. His action had no relation to the merits of the case.

Another contention that is based on the jurors' affidavits and not on the record is that there was an unauthorized communication between the trial court and the jury regarding an instruction. In the affidavits it was said that the jury was unclear as to what verdict forms to sign, and that the bailiff was asked to request the judge for further instructions. "The bailiff came back and said that the judge had given us all the instructions both orally and written and could say no more," one of the affidavits read.

Even if this be considered as an unauthorized communication with the jury, the defendant's argument must fail. It is clear from our decisions that, as we put it in *People v. Canaday, 49 Ill.2d 416, 426*, "Before a jury verdict will be set aside because of an unauthorized communication with the jury, it is necessary for a defendant to show prejudice. (*People v. Williams, 38 Ill.2d 115, 126; People v. Georgev, 38 Ill 2d 165, 177.*)" There is no claim or proof of specific prejudice.

The last contention of error we consider is that the defendant "*** was denied his absolute right to substitution of Judge William Webb Johnson [the trial judge], thus rend[er]ing all proceedings subsequent to the orders of denial void." This contention is also made in another appeal by the defendant which is pending in this court, (*People ex rel. Daniel Walker v. Pate,* No. 43622), in which the defendant challenges the dismissal without a hearing, by the circuit court of Will County, of his petition for a writ of *habeas corpus.* We have consolidated the appeal in No. 43622 with this appeal. It appears that the basic claim in the petition for a writ of *habeas corpus* was that the circuit court of Lake County was without jurisdiction to

sentence the defendant to the penitentiary because there had been an erroneous denial of his motion to substitute another judge for Judge William Webb Johnson, who presided at the defendant's trial. Our resolution of the question as to whether there was error in the denial of the motion will dispose of the related contentions in both appeals.

Subsection (a) of section 114—5 of the Code of Criminal Procedure (Ill. Rev. Stat. 1969, ch. 38, par. 114—5) gives a defendant an absolute right to a substitution of a judge if his motion is filed "[w]ithin ten days after a cause involving only one defendant has been placed on the trial call of [a] judge ***." A defendant whose motion for substitution is not brought under subsection (a) may, under subsection (c) of section 114—5, "*** move at any time for substitution of judge for cause, supported by affidavit."

The record shows that prior to September 19, 1969, the defendant's motion for the substitution of two other judges previously assigned to his case had been allowed. Following these substitutions, on September 19, 1969, the case was set for trial before Judge Johnson on October 28, 1969. On October 27, 1969, the defendant filed a motion to substitute another judge for Judge Johnson. From this record, it is obvious that more than ten days had elapsed between the date the case had been placed on the trial call of Judge Johnson and the date the defendant had filed his third motion to substitute a judge. Thus, the defendant did not bring himself within the 10-day provision of section 114—5(a) (Ill. Rev. Stat. 1969, ch. 38, par. 114—5(a)), and the trial court properly treated his motion as one for the substitution of a judge for cause under subsection (c). (Ill. Rev. Stat. 1969, ch. 38, par. 114—5(c).) The defendant had no absolute right to substitution of a judge.

Another reason, of course, for the rejection of the

motion for substitution by right was that the defendant, by substituting two judges, had already exhausted his rights under section 114—5(a).

The defendant's additional claim that he established a right to a substitution for cause under section 114—5(c) is also without substance. In an affidavit attached to his motion for substitution for cause and at the hearing held on the motion, the defendant alleged only that on September 19, 1969, he had mailed certain motions to Judge Johnson, and that he had requested in letters attached to the motions immediate rulings on the motions. That Judge Johnson did not rule or otherwise respond to his motions before October 27, 1969, the defendant argued in the trial court, as he does here, established the prejudice of the judge within the meaning of section 114—5(c). The claim that prejudice of the judge is shown simply by his not ruling more promptly on this series of the defendant's numerous motions is not sustainable.

There are other contentions which the defendant makes, but the clear want of merit in them warrants our not formally discussing them in detail in this already lengthy opinion.

· For the reasons given, the judgments of the circuit courts of Lake County and Will County are affirmed, except for that portion of the judgment of the circuit court of Lake County convicting the defendant of aggravated battery, which portion is reversed.

*43622 — Judgment affirmed.*
*43832 — Affirmed in part and*
*reversed in part.*