THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTOINE WARD, Defendant-Appellant.

First District (3rd Division)   No. 1—96—4118

Opinion filed December 23, 1998.

Daniel T. Coyne, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Mary P. Needham, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:
On March 29, 1994, at about 5 p.m., 10-year-old Rodney Collins was with friends, riding his bicycle outside his home on Winchester Street in Chicago, Illinois. On the corner of 51st and Wentworth, two men made "pitchfork" hand signals, signifying allegiance to the Gangster Disciples street gang. The same men were also "throwing down the [five]," signifying disrespect for the Blackstones street gang. The Gangster Disciples is a gang affiliated with a larger group called the "Folks," and the Blackstones are affiliated with a group called the "People." The two groups are enemies. A few minutes after making the gang signals, the two men ran down Winchester and shouted, "[W]e got you hooks now." The two men began shooting at 10 to 15 children playing on the street. Two different kinds of gunfire were heard by witnesses. Rodney Collins was shot in the back. He later died from his injuries.

After a bench trial, defendant Antoine Ward was found guilty of Collins' murder and was sentenced to 29 years in prison. Defendant argues on appeal that the trial court erred in: (1) denying his motion for a "bill of particulars"; (2) denying his motion to quash arrest; (3) denying his motion to suppress statements; and (4) finding him guilty beyond a reasonable doubt. We affirm.

Before trial, the following evidence was presented at a hearing on defendant's motion to quash arrest and suppress evidence. Police officers John Murray and Christine Keane testified that they investigated Collins' murder on March 29, 1994. They went to 5210 South Wood Street after a homeless man told them that members of the Gangster Disciples "hung out" in a basement there. At about 11:15 p.m., Murray and Keane knocked on the front door. Anemeya Bostic answered the door. She told Murray and Keane that her brother, Donald Bostic, lived in the basement and directed them to the back door. The officers

went to the back door, where they were met by Anemeya and Donald. Donald said that his girlfriend and another boy were in the basement. The officers asked if they could enter the apartment and talk to the boy. Donald agreed and let the officers in.

Murray and Keane found defendant asleep on a couch. Murray approached defendant and gave him a "shake" or a "nudge" and said "wake up." Defendant sat up and looked at the officers. Officer Murray asked defendant for his name but defendant did not respond. Murray again asked defendant his name and where he lived. Defendant "sprang" off the couch and said "I'll kick your ass." Defendant "got real tight" and held his arms back "as if he was ready to strike." Murray then arrested defendant for assault.

Anemeya testified for the defense. She denied having a conversation with police officers at her front door. She did not see them until they were already in the basement. Anemeya testified that four police officers entered the basement. One officer held defendant by the arm and told him he would be taken to the police station for questioning. Defendant said he did not know what the officers were talking about and did not understand why he could not be questioned there rather than at the police station. Anemeya then went to the porch, where she saw Rodney Collins' cousin, Robert Collins. Robert told her that he brought the officers to the house because he thought some "folks" who shot his cousin were in the basement.

Donald Bostic testified that on the evening of March 29, 1994, he was in the basement when he saw lights flashing from the rear of the basement. Donald said he went to the back of the basement and asked, "Who is that?" A police officer answered and came through the door, flashing a light in his eyes and asking Bostic who he was. One of the officers began walking through the basement and asked if he could search. Donald responded, "you already [sic] searching." The officer went to the front of the basement, woke defendant, asked defendant to get up, and said that he wanted to ask defendant some questions. Defendant slowly stood up, complied with the officer's requests and never threatened the officer. Donald testified that only the male officer came into the basement. He also said his sister was not in the basement at the time of defendant's arrest, but was arguing with police on the back porch.

Police officer Lisa Rocco-Pignato testified that she arrived at 5210 South Wood at about 11:15 p.m. and saw police officers Murray and Keane struggling with defendant on the basement floor. Rocco-Pignato helped hold defendant so the officers could handcuff him. After interviewing Officer Murray, she wrote the police report. She testified that Murray told her defendant "sprang up off the couch at him" but that she did not include that in her report.

Assistant State's Attorney Gregory Nugent testified in rebuttal that he was present when Assistant State's Attorney Matthew Coghlan interviewed Anemeya Bostic. Nugent testified that Anemeya told Coghlan that, when she went down to the basement, officers were handcuffing defendant. The police asked defendant his name, but he refused to answer.

The trial court denied defendant's motion to quash arrest.

The following evidence was presented at a hearing on defendant's motion to suppress statements. Detective William Foley testified that at about 10:45 a.m. on March 30, 1994, he and Detective Michael Clancy interviewed defendant for about 20 minutes at the police station. Foley advised defendant of his *Miranda* rights, and defendant said he understood them. Foley testified that no one physically touched or struck defendant during the interview or promised leniency in return for a statement. Foley did not tell defendant that he was merely a witness in the case or that defendant would be released if he made a statement.

Detective Kenneth Boudreau testified that on March 30, 1994, at about 6:30 p.m., he and Detective John Halloran interviewed defendant for about 45 minutes. Halloran advised defendant of his *Miranda* rights, and defendant said he understood them. No one touched defendant or promised him anything in return for his statement. Boudreau testified that, other than taking defendant to the bathroom and giving him food and drink, he had no other contact with defendant that day. The next day, Boudreau and Assistant State's Attorney Steven Klaczynski spoke again with defendant at about 7:30 p.m. for about 25 minutes. Klaczynski gave defendant *Miranda* warnings. Boudreau then left the room for a few moments. When he returned, defendant agreed to give a handwritten statement. Part of the written statement said that defendant had not been threatened or promised anything in return for his statement. Defendant was asked to appear before the grand jury the next day. Defendant was then released.

Defendant did not appear before the grand jury. On April 21, 1994, Boudreau was notified by tactical officers that defendant was on South Honore. Defendant was then arrested on an outstanding warrant for possession of a controlled substance. The next day at about 12:30 p.m., Boudreau was present when Assistant State's Attorney Neera Walsh interviewed defendant. Walsh read defendant his *Miranda* rights, and defendant acknowledged those rights by placing his initials next to each of the rights listed on a form. Boudreau testified that defendant gave new information and also acknowledged the substance of his written statement. Defendant was not threatened or promised leniency during the interview. At the end of the conversation, defendant was arrested for murder.

Detective Daniel McDonald testified that on March 30, 1994, at about 10:15 a.m., he and his partner transported defendant from the 9th district police station to a police station at 51st and Wentworth Streets. While defendant was in McDonald's presence, no one threatened, struck or spoke to defendant.

Defendant testified on his own behalf. He said that after he was arrested on March 29, 1994, Officers Boudreau and McDonald took him to a police station at 51st and Wentworth Streets. Defendant testified that he was handcuffed to a bench and left alone for a "nice period of time." Boudreau and another officer questioned him about Collins' murder for about 45 minutes. Defendant claimed that he was never given *Miranda* warnings. Defendant said he knew nothing about Collins' murder. Boudreau said if defendant helped him, he would help defendant. Boudreau showed defendant photographs, but defendant did not recognize anyone in the photographs. Later that evening, defendant asked to make a telephone call, to be released, and to use the bathroom. All his requests were denied.

Defendant testified that the next day, Boudreau and another officer told him that other witnesses had placed him at the scene, asked defendant what he knew, and again showed him photographs. Defendant testified that the other detective left the room, and Boudreau attempted to make "friendly conversation" with defendant. Boudreau said that if defendant cooperated with Boudreau, Boudreau would cooperate with defendant. But defendant insisted he knew nothing about Collins' murder. Boudreau then left the room, and a tall officer with blond hair and cowboy boots entered. That officer told defendant he was lying, called defendant names, stepped on defendant's left hand, and hit defendant on the side of his head three times. Defendant asked to use the bathroom, and when he was not allowed to do so, he urinated in a desk drawer.

Defendant testified that the next day Boudreau and several other officers returned. Defendant was not given *Miranda* warnings. For about half an hour, the officers called him names and said that if defendant did not provide the information they needed, he would go to the penitentiary for 20 years. Defendant refused to give a statement. Boudreau showed defendant photographs. Defendant identified Michael Taylor as someone he knew from school. Defendant was then taken to a room where Kenneth McGraw was sitting and Boudreau asked McGraw if he knew defendant. McGraw answered "yes." Defendant was then left alone in an interview room for about two hours.

When Boudreau later returned, he said that "Yogi" had seen defendant give somebody a gun. Defendant denied that he gave anyone a gun. Boudreau told defendant "all you got to give me is a statement,

and I'll let you go home." Boudreau said he would give defendant some time to think about it and left the room. He returned with the tall, blond-haired officer. The two officers repeatedly told defendant that he could leave if he gave a statement and that he would not have to testify before a grand jury. Defendant then gave a statement.

Defendant denied giving a handwritten statement to an assistant State's Attorney. Defendant testified that Boudreau, not Klaczynski, wrote out the statement. Defendant signed the statement because Boudreau promised he would be released if he did. Shortly after he signed the statement, he was released.

Defendant testified that he was again arrested on April 21, 1994. He was first taken to a police station and then to the State's Attorney's office. Boudreau told him that he would be going home, but that he first had to sign a *Miranda* warnings form. After signing the form, he was taken back to the police station and charged with murder. Defendant testified that he never met with Assistant State's Attorney Walsh.

In rebuttal, Assistant State's Attorney Klaczynski testified that on March 31, 1994, at about 7:30 p.m., he interviewed defendant for about 30 minutes in the presence of Boudreau. Klaczynski advised defendant of his *Miranda* rights, and defendant said he understood them. Klaczynski asked Boudreau to leave the room and asked defendant how he had been treated by the police. Defendant told Klaczynski he had been treated "very nicely." Defendant said he had been allowed to use the bathroom and had been given pop to drink. Defendant agreed to reduce his statement to writing, so Klaczynski wrote out defendant's statement. Defendant reviewed the statement before he signed it. Klaczynski testified that no one struck defendant in his presence, and no one promised defendant that he would be released if he gave a statement. After defendant completed the written statement, Klaczynski directed that defendant be released because, in Klaczynski's opinion, there was not enough evidence to charge defendant with murder.

Assistant State's Attorney Walsh testified that on April 22, 1994, at about 12:25 p.m., she spoke with defendant at the State's Attorney's office. Defendant was read *Miranda* rights and he initialed a form that listed the rights. Walsh asked defendant if the written statement was true. Defendant said that it was and then gave Walsh additional information. Neither she nor anyone in her presence told defendant that he would be released if he gave a statement. Defendant never complained to her that he had been mistreated by the police.

The trial court denied defendant's motion to suppress statements.

At trial, Detective William Foley testified that during his interview with defendant on March 30, 1994, defendant told him that Carl Bran-

nigan took a gun from defendant on the day of the shooting. After Brannigan took the gun, he told defendant that "they had to take care of business."

John Naujokas, a forensic investigator, testified that on March 29, 1994, he recovered a "black Tallon" bullet and 24 nine-millimeter Luger cartridge cases at the murder scene. Richard Chenow, a firearms technician, testified that he examined the bullet and cartridge cases. Neither Naujokas nor Chenow could determine whether the cartridge cases came from the same gun.

Kenneth McGraw testified that he was a member of the Gangster Disciples. Shortly before the shooting in March 1994, he saw Michael Taylor, Sean Tyler, Reginald Henderson and a male named "Carl" at 51st and Honore Streets. Defendant told McGraw that they could not be there because there was "going to be some shooting" and they left the area.

Detective Halloran testified that when he and Detective Boudreau spoke with defendant on March 30, 1994, defendant gave the following oral statement. Defendant was a Gangster Disciple and he was "working security" for a drug operation on 51st and Honore Streets on March 29, 1994. He was armed with a 9 millimeter handgun. Carl Brannigan, who was "chief of security" for the Gangster Disciples, and Michael Taylor approached him. Brannigan said "they were going to shoot the Blackstones on Winchester" and asked defendant for his weapon. Defendant handed Brannigan the gun, and Brannigan told defendant to "shut down the narcotics sales" for about three hours. Defendant then went to a house at 50th and Wolcott Streets and sat on the porch. A few moments later he heard more than 10 shots fired. On cross-examination, Halloran testified that, in Detective Boudreau's notes of the interview, defendant said that Brannigan told defendant to give him the gun first and then said he was going to "take care of business." Halloran also acknowledged that another report reviewed and signed by Halloran indicated that Brannigan "took" the gun from defendant and then said they had to "take care of business."

Charles Breckenridge testified that on March 29, 1994, he saw Michael Taylor shoot an "automatic Tech-9" gun at Rodney Collins on Winchester Street. Detective James O'Brien testified that Breckenridge had earlier identified Taylor in a lineup.

Assistant State's Attorney Steven Klaczynski testified that when he interviewed defendant on March 31, 1994, defendant signed a written statement containing the same information as the oral statement to Halloran and Boudreau. The written statement differed only in that Brannigan did not say "they were going to shoot Blackstones on Winchester," but that they needed defendant's gun to "take care of

business." But defendant's written statement said that "taking care of business" meant shooting Blackstones on Winchester.

Assistant State's Attorney Walsh testified that she interviewed defendant on April 22, 1994. Defendant confirmed the accuracy of his written statement. Defendant also told Walsh that he knew on March 29 when he gave Brannigan the gun that it would be used to shoot a Blackstone in retribution for an incident that happened the day before, involving some young members of the Gangster Disciples. No handwritten report was made of Walsh's interview with defendant.

The State rested. Following a motion for a directed verdict, defendant rested.

Defendant first argues that the trial court erred by denying his request for a "bill of particulars." Defendant's pretrial motion for a "bill of particulars" referred to a supplementary police report that lists 10 reporting officers and contains summaries of 19 witness interviews. Defendant sought "the date, time, place and parties present for each interview." Defendant contends that without the bill of particulars, he was unable to lay the proper foundation to use the police report for impeachment.

The trial court denied the motion, noting that defendant had been given the names of the officers who interviewed defendant and that the prosecution was not required to provide an index of dates, times and places of other witness interviews. The court offered to revisit the issue or to "give [defendant] leeway" if the lack of information later became crucial.

The State argues that defendant was not entitled to the bill of particulars and that, even if he were, he was not prejudiced by the lack of information.

The only authority defendant cites is *People v. Allen*, 47 Ill. 2d 57, 264 N.E.2d 184 (1970), and *People ex rel. Walker v. Pate*, 53 Ill. 2d 485, 292 N.E.2d 387 (1973). In *Allen* and *Pate*, our supreme court held that, when asked, the prosecution must give defendant witness statements in the State's control that may be used for possible impeachment. See *Pate*, 53 Ill. 2d at 501; *Allen*, 47 Ill. 2d at 59. But defendant's motion for a bill of particulars did not seek witness statements already in existence—those were given to defendant. Rather, defendant's motion sought to compel the State to create a new document with additional information about witness statements.

■ Defendant cites no case, statute or rule that would require the State to create the "bill of particulars" sought here. Section 114—2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114—2 (West 1996)) provides that a defendant is entitled to a bill of particulars specifying the particulars of the offense necessary to prepare a defense.

But defendant does not allege that his indictment contained insufficient particulars about the offense. "A defendant is not entitled to request a general disclosure of evidence through a motion for a bill of particulars." *People v. Therriault*, 42 Ill. App. 3d 876, 888, 356 N.E.2d 999 (1976). Supreme Court Rule 412 sets out what information a prosecutor is required to disclose to a criminal defendant. 134 Ill. 2d R. 412. Although the prosecutor must supply a list of all witnesses to the making and acknowledgement of a defendant's statement (see 134 Ill. 2d R. 412(a)(ii)), the same is not required of all witness statements.

We also agree that defendant has not shown that he was prejudiced by the lack of information. The State maintains that defendant was able to fully cross-examine the State's witnesses. Defendant's theory of the case was that the State did not meet its burden of proof, especially on the factual questions of whether defendant knew the gun would be used in a murder and whether the gun actually was used. Defendant does not point to a part of the police report that he would have used to bolster his theory or suggest when during trial the substance of the report could have been used to impeach a witness if he had been able to establish a foundation. Although the trial court stated it would revisit the issue if needed, defendant never renewed his request for the details sought in his motion for a bill of particulars. The trial court did not err in denying defendant's motion for a "bill of particulars."

■ Defendant next argues that the police did not have probable cause to arrest him. In the context of a warrantless arrest, an officer has probable cause when he has reasonable grounds to believe the person is committing or has committed the offense. *People v. Warren*, 173 Ill. 2d 348, 357-58, 671 N.E.2d 700 (1996). Reasonable grounds to arrest exist when a reasonable and prudent person, with the same knowledge as the police officer, would believe the defendant committed the offense. *People v. Tisler*, 103 Ill. 2d 226, 236-37, 469 N.E.2d 147 (1984). We will not disturb a trial court's finding of probable cause unless it is manifestly erroneous. *People v. Zinnamon*, 266 Ill. App. 3d 671, 676, 639 N.E.2d 671 (1993).

■ Defendant argues that the officers' entry into the basement apartment was made without probable cause. The arresting officer testified that Donald consented to a search of the apartment. When an officer has consent to search an apartment, probable cause to search is not needed. See *People v. Baltazar*, 295 Ill. App. 3d 146, 149, 691 N.E.2d 1186 (1998). To the extent that defendant relies on Donald's testimony that he did not consent, we note that "[t]he trial judge's function in making a probable cause determination is to weigh the

testimony, assess the credibility of the witnesses, and draw reasonable inferences from the testimony." *Zinnamon*, 266 Ill. App. 3d at 676, citing *People v. Reynolds*, 101 Ill. App. 3d 576, 579, 428 N.E.2d 694 (1981). The trial court found the State's witnesses more credible here, and we cannot conclude that this finding was manifestly erroneous.

Defendant next argues that Murray "possessed no information which would have allowed him to [perform] a *Terry* stop" at the moment he "nudged" defendant and asked who he was. See *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The State argues we need not inquire into whether Officer Murray had reasonable suspicion for a *Terry* stop since Murray's conduct did not amount to a seizure under the fourth amendment. We agree.

■ A person is not "seized" unless his freedom of movement is restrained by physical force or a show of authority. *United States v. Mendenhall*, 446 U.S. 544, 553-54, 64 L. Ed. 2d 497, 508-09, 509 S. Ct. 1870, 1877 (1980). A show of authority amounts to a seizure when a reasonable person in the same circumstances would not feel free to " 'go about his business.' " *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398, 111 S. Ct. 2382, 2386 (1991), quoting *California v. Hondari D.*, 499 U.S. 621, 628, 113 L. Ed. 2d 690, 698, 111 S. Ct. 1547, 1552 (1991). A police officer does not violate the fourth amendment's guarantee against unreasonable search and seizure by approaching a person and questioning him. *Florida v. Royer*, 460 U.S. 491, 497, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (1983).

■ We do not believe that a reasonable person in defendant's position would not feel free to leave based on a "nudge" and a request for such basic information as the person's name and where he lived. Officer Murray had consent to search the apartment and was merely questioning a person found there. Defendant was not seized until he was arrested a short time later.

■ Defendant next argues that Murray did not have probable cause to arrest him because defendant's conduct in rising off the couch and declaring "I'll kick your ass" was not reasonable grounds to believe an assault had occurred. Defendant argues that "[w]ords alone are not usually enough to constitute an assault. [Citation.] Some action or condition must accompany those words before there is a violation of the statute." *People v. Floyd*, 278 Ill. App. 3d 568, 570-71, 663 N.E.2d 74 (1996). Defendant emphasizes that he did not "ball his hands into fists, did not make any move toward the officers, did not step away from the couch and did not resist arrest." Defendant notes that the police report of the incident did not indicate that defendant "sprang" off the couch or that Officer Murray felt threatened.

Murray's and Keane's testimony supports the trial court's finding

of probable cause. Murray did not rely on defendant's threatening words alone. He also relied on defendant's conduct and demeanor. We conclude that a reasonable person in Murray's position would believe defendant had committed an assault when he "sprang" off the couch, made a verbal threat, and stood with his "arms back" as if "ready to strike."

We next address defendant's argument that the trial court erred by denying his motion to suppress because his statements to police were not voluntarily given.

■ Whether a confession is voluntary is a question of fact for the trial court and will not be reversed unless it is against the manifest weight of the evidence. *People v. House*, 141 Ill. 2d 323, 376, 566 N.E.2d 259 (1990). To determine whether a confession is voluntary, we consider the totality of circumstances of the suspect's interrogation. See *House*, 141 Ill. 2d at 376. Among the elements considered are age, education, intelligence, experience with the criminal justice system, the length of detention and interrogations, whether the accused was advised of constitutional rights, and whether he was mistreated or abused. *People v. Williams*, 230 Ill. App. 3d 761, 776, 595 N.E.2d 1115 (1992).

■ Defendant relies primarily on his testimony. Defendant argues that he was detained for almost 48 hours in a small interview room; that he was interrogated four times for a total of about four hours; that police officers repeatedly refused his requests to be released and to use the rest room; that he was forced to urinate in a desk drawer in the interview room; that Boudreau promised he could leave if he gave a statement; and that a police officer struck him several times and stepped on his hand.

Defendant's almost 48-hour detention, while relevant, does not heavily favor his position that his statement was coerced. See, *e.g.*, *Williams*, 230 Ill. App. 3d 761 (finding confession voluntary when statement was given after defendant had been detained over 50 hours). Defendant was not questioned incessantly during his detention, but was interviewed only four times. Each interview lasted between 20 and 45 minutes.

The State presented testimony contradicting each of defendant's other allegations. Witnesses to each interview testified that defendant was given *Miranda* warnings. The officers who testified said that no one physically touched him while he was interviewed; that defendant was not promised anything in return for his statement; and that defendant was allowed to use the rest room. Further, Assistant State's Attorney Klaczynski testified that defendant said he had been treated fairly by the police. It is for the trier of fact to decide the weight to

give testimony and to decide the witnesses' credibility. See *People v. Turner*, 156 Ill. 2d 354, 374, 620 N.E.2d 1030 (1993). The trial court's finding was not against the manifest weight of the evidence.

Defendant's last argument is that the State failed to prove defendant guilty beyond a reasonable doubt. Defendant argues that there was no evidence that Brannigan participated in the shooting or that the gun he gave Brannigan was used to shoot Rodney Collins.

■ When the sufficiency of the evidence is challenged on appeal, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. *People v. Nitz*, 143 Ill. 2d 82, 95-96, 572 N.E.2d 895 (1991). To convict defendant on a theory of accountability, the State must prove: (1) defendant solicited, ordered, abetted, agreed, or attempted to aid another in the planning or commission of the crime; (2) defendant's participation took place before or during the commission of the crime; and (3) defendant had the concurrent intent to promote or facilitate the commission of the crime. 720 ILCS 5/5—4 (West 1996); *People v. McFarland*, 228 Ill. App. 3d 107, 122, 592 N.E.2d 471 (1992).

■ In *People v. Taylor*, our supreme court held:

"A defendant may be deemed accountable for acts performed by another if defendant shared the criminal intent of the principal, or if there was a common criminal plan or purpose. [Citations.] Words of agreement are not necessary to establish a common purpose to commit a crime. The common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. [(*People v. Reid*, 136 Ill. 2d 27, 62, 554 N.E.2d 174 (1990); *People v. J.H.*, 136 Ill. 2d 1, 17, 554 N.E.2d 961 (1990).)] *** Defendant's flight from the scene may *** be considered in determining whether defendant is accountable. (*Reid*, 136 Ill. 2d at 62.) Evidence that defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *J.H.*, 136 Ill. 2d at 17." *People v. Taylor*, 164 Ill. 2d 131, 140-41, 646 N.E.2d 567 (1995).

■ The State was not required to prove that Brannigan was one of the shooters or that the shot that killed Collins came from the gun defendant gave to Brannigan. An armed, active member of a street gang in charge of security on a drug corner can fairly be described as one voluntarily attached to a group bent on illegal acts. The common criminal plan or purpose of the Gangster Disciples has decades of bloodshed as part of its history. That they were about such business in this case and that Ward attached himself to it is supported by the evidence before us. To suggest that so-called "security officers" can shield

themselves from culpability by handing over weapons to other gang members and leaving the scene would be to mock the accountability statute.

Michael Taylor was present when Brannigan asked for the gun so "they" could "take care of business," and Michael Taylor was identified as a shooter in the murder that occurred shortly after. Defendant knew that "taking care of business" meant they were going to shoot Blackstones in retribution for an earlier incident and that the shooting was going to occur that day. We believe a reasonable trier of fact could infer from these facts that the gun was used, or that defendant intended that the gun be used, in the shooting and that defendant in doing so abetted or attempted to aid in the commission of the offense by supplying the gun.

■ Defendant also challenges the testimony of Neera Walsh. Defendant suggests that Walsh's testimony that defendant knew the gun was going to be used to shoot Blackstones is not credible since there are no written reports of the statement and since Walsh wavered in her explanation of why no written report or statement was made. But the lack of a report reflects only on Walsh's credibility. We defer to the trial court on questions of witness credibility and the weight to be give testimony. *People v. Nitz*, 143 Ill. 2d 82, 95, 572 N.E.2d 895 (1991). Only the trial court has had the opportunity to hear Walsh's testimony and to observe her demeanor. We see no reason to disturb the trial court's finding regarding Walsh's credibility.

Affirmed.

CERDA and BURKE, JJ., concur.