THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY WILLIAMS, a/k/a Princeton Dorsey, Defendant-Appellant.

First District (1st Division)   No. 1—88—1385

Opinion filed June 8, 1992.

762

764

Rita A. Fry, Public Defender, of Chicago (Stephen Richards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, Sara Dillery Hynes, and Jeanne Lobelson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Anthony Williams, a/k/a Princeton Dorsey, was found guilty of murder and armed robbery. Defendant was sentenced to natural life imprisonment. Defendant now appeals. For the reasons which follow, we affirm.

The record on appeal indicates the following facts.

MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE

Prior to trial, the trial court heard defendant's motion to quash his arrest and suppress evidence. At this hearing, the sole defense witness was Detective David Garcia, who testified that defendant was arrested without a warrant on the 1400 block of Madison in the vicinity of Grand and Ashland during the early morning hours of July 15, 1985.

The State called Detective Thomas Blomstrand, who testified that at 10:30 p.m. on July 14, 1985, he was called to the scene of a homicide at the Grand-Ashland Hotel, located at 466 N. Ashland Avenue in Chicago. Blomstrand was directed by other officers at the scene to room 210, where he saw the body of Van Musgrove, who rented room 210. Blomstrand noted a knife lying on Musgrove's shoulder and blood on the floor and walls of the room.

Blomstrand then spoke with Debra Collins, the hotel manager. Collins stated that her cousin had complained of a strong odor on the third floor. When Collins did not get any response at room 210, she opened the door and discovered Musgrove's body.

Collins further stated that she then spoke with a man she knew as "Tyler," or "Prince," an African-American male in his thirties who lived next door in room 211. Collins stated that "Prince" tried to contact Musgrove's family. When Collins stated that she was going to call the police, "Prince" hurriedly left the hotel. According to Blomstrand, this man had told Collins that he had killed four people and had just gotten out of jail for murder. Collins also told him that the man from room 211 lived with a transvestite named "Kim Bouchee"; Musgrove lived with a transvestite named "Che-Che." Janet Striblin told Blomstrand that Musgrove had been in an argument with the occupants of room 211 a couple of days earlier; the three men had been drinking at the time. Ceasar Grant, Collins' husband, told Blomstrand that Musgrove had no visitors recently.

Blomstrand then testified that the police examined the common areas of the hotel. Blomstrand stated that what appeared to be blood was found in the hallway outside room 210 and in the common washroom on that floor. There also appeared to be a patent fingerprint in blood on the door to room 211. After gaining entrance to room 211, Blomstrand noticed another patent fingerprint in blood on the inside of the door and an apparent drop of blood on the quarter round behind the door.

Officer Joseph Santoro testified that at about midnight on July 14, 1985, he and Officer David Garcia spoke with Blomstrand at 466

N. Ashland Avenue. Blomstrand told them that two possible suspects were the man Collins called "Tyler" and "Prince" and the transvestite named "Kim." From prior experience, Santoro knew "Tyler" was a transvestite's alias and so informed Blomstrand.

Officer David Garcia testified that he and Officer Santoro began to look for the two suspects in an area on Madison Street that Kim Bouchee was known to frequent. A person Garcia knew from prior contacts directed the officers to an abandoned building on the 1400 block of Madison where Bouchee was believed to be working as a prostitute. The officers found Bouchee inside and took him back to their car. Garcia returned to Madison Street to give his contact a number to phone if he saw "Prince." The officers took Bouchee to Area 4 headquarters, where they noted apparent blood on Bouchee's purse and shoes.

While at headquarters, the officers heard by radio that "Prince" was in the vicinity of the 1400 block of Madison. Garcia and his sergeant responded to the call; Santoro remained at headquarters. En route, Garcia heard by radio that other units were also proceeding to Madison Street. When Garcia and his sergeant arrived in the area, police were already securing the area. Garcia approached his contact, who identified "Prince" from the group of individuals in the area. Garcia identified "Prince" as the defendant in court. Garcia approached defendant and asked "How is it going, Prince?" Defendant responded, "What's up?" Defendant appeared to have blood on his shoes. Defendant was arrested and brought to headquarters.

Detective Blomstrand testified on rebuttal that he asked the hotel's janitor to remove the door to room 211 for three reasons. First, Kim Bouchee, who had been in the argument with "Prince" and Musgrove, had not been seen for several days. Second, Blomstrand had been advised that the patent fingerprint on the door could not be adequately lifted and analyzed with the resources available at the scene. Third, the odor which prompted the discovery of Musgrove's body permeated the entire floor; Blomstrand was concerned that another body might be found inside.

Detective Louis Elzy, Jr. (Elzy), testified that on July 17, 1985, he spoke with Bouchee and obtained consent to search room 211; evidence technicians were sent to the scene. Detective Albert Mientus testified that a second search conducted on July 17, 1985, for which there was oral approval, resulted in the recovery of two watches and a knife.

Defendant's motion was denied.

MOTION TO SUPPRESS STATEMENTS

The trial court also heard defendant's pretrial motion to suppress statements he made to the police. Defendant contended that the statements were involuntary. The testimony of the State's witnesses is presented in chronological order.

The State called Detective John Dahlberg, who was Detective Blomstrand's partner. Detective Dahlberg testified that he met with defendant in an interview room at Area 4 headquarters at about 1:30 a.m. on July 15, 1985. He introduced himself and informed defendant of his constitutional rights. Defendant agreed to speak, but denied knowledge regarding Musgrove's death.

The two men spoke again at about 3:15 a.m. in the same interview room, after Dahlberg again informed defendant of his constitutional rights. This second conversation lasted about 20 minutes. Defendant was not handcuffed on either occasion. Dahlberg did not obtain a written waiver of defendant's constitutional rights on either occasion. Defendant again denied knowledge concerning Van Musgrove's death. Dahlberg then asked defendant to remove some of his clothes for scientific examination. Defendant was given a paper garment to wear.

At 4:45 a.m., Officer Santoro took defendant to the 13th District police station for booking and processing. Defendant was returned to the interview room by 8 a.m. on July 15, 1985.

Detective C.J. Rickher III testified that at some time between 8:30 a.m. and 5 p.m. on July 15, 1985, he responded to a knock on the interview room door. Defendant indicated that he needed to use the washroom; Rickher took defendant there. Defendant was not in handcuffs at that time. Defendant asked Rickher why he was still being detained by the police. Rickher, after informing defendant of his constitutional rights, told defendant that scientific tests were ongoing. When defendant told Rickher that he had nothing else to say, Rickher left him in the interview room. The conversation was less than five minutes in duration. Rickher took defendant to the washroom on at least one other occasion, did not deny any of defendant's requests and did not hear defendant complain of any pain.

Detective Dahlberg testified that he returned to duty at 4:30 p.m. on July 15, 1985. Defendant remained in the interview room and was not handcuffed. Dahlberg asked defendant if he wanted to use the washroom or needed food. Dahlberg gave defendant sandwiches and coffee. Defendant used the washroom between 4:30 p.m. on July 15 and 1 a.m. on the 16th. Dahlberg stated that he saw defendant at 9

p.m. on July 15 and 12 a.m. on July 16. Dahlberg described similar events regarding defendant's treatment from 4:30 p.m. on July 16 to 1 a.m. on July 17.

Detective Elzy (who was called as a rebuttal witness) testified that he was on duty from 12:30 a.m. to 9 a.m. on July 17, 1985. Detective Elzy stated that he spoke with defendant about the Musgrove case twice during the early morning hours of July 17. On the first occasion, he was accompanied by Detective Mientus and Sergeant Louis Sykes. According to Elzy, defendant denied any involvement in the matter, but did not indicate that he wished to remain silent or wanted to see an attorney. This first conversation lasted about 10 minutes. Defendant was not handcuffed and never complained of pain to Elzy. Elzy stated that he did not hit the defendant and did not see others hit defendant with a blackjack.

At approximately 4 a.m., Elzy and Mientus questioned defendant again for about 10 or 15 minutes. Elzy further testified that he was present for another conversation which took place at about noon on July 17, 1985.

Sergeant Louis Sykes (another rebuttal witness) testified that he did not actively participate in the questioning of defendant, but responded if defendant asked to use the washroom during his shift, which was between 4 p.m. and 1 a.m. Sykes stated that he never struck defendant with a blackjack.

Detective Michael O'Sullivan testified that he saw defendant being taken to the washroom on the morning of July 17, 1985. He also took food to defendant. O'Sullivan testified that he spoke with defendant for about an hour beginning at about 11 a.m. on July 17. Detectives Elzy and Mientus were also present. O'Sullivan advised defendant of his rights and informed him of facts obtained during the investigation of the Musgrove case. According to O'Sullivan, no promises of leniency were made. Defendant indicated that he wished to make a statement.

O'Sullivan spoke with defendant again at 4 p.m. on July 17. He was accompanied by Detective Mientus and Assistant State's Attorney Wayne Jalaski. This conversation lasted between 30 and 40 minutes. Defendant was informed of his constitutional rights; however, no written waiver of these rights was obtained.

At about 6 p.m., O'Sullivan returned to the interview room with Assistant State's Attorney Jalaski and a court reporter named Blanca Lara. During this conversation, Detective Elzy brought items into the room. Afterwards, a typewritten statement was prepared. This statement was signed by O'Sullivan, Jalaski and defendant. Defendant was

then photographed; O'Sullivan identified the photograph, which was signed by O'Sullivan, defendant and one other person. O'Sullivan stated that defendant did not complain to him of pain, and he did not see defendant handcuffed or beaten by an African-American police officer. Defendant did not ask to remain silent or request an attorney.

Defendant testified that Detectives Elzy and O'Sullivan, along with two other officers, interrogated him in the interview room on the morning of July 15, 1985. Defendant described the interview room as small, with a table, a chair and a handcuff ring on the wall; the room did not have a clock or a window. According to defendant, he was handcuffed at this time. The police told him he was being charged with homicide and that they would see about getting him a manslaughter charge if he gave a statement. Defendant asked for a lawyer and the police left.

About 20 to 25 minutes later, Detectives Elzy and O'Sullivan returned to tell defendant that the public defender's office had been notified of his request. A man defendant called Jerry West entered the room and identified himself as a public defender who would represent defendant if he wished. At this point, two more detectives took defendant to an office where they removed his clothes, except for his shorts and socks, and gave him a paper gown to wear. The detectives also cut his fingernails.

According to defendant, he was allowed to speak with Jerry West in this office, but that police officers remained just outside the open door. West told defendant there was no way defendant could get a lesser charge unless he confessed to the police. Defendant told West he did not sound like a public defender; the police returned defendant to the interview room.

About 15 minutes later, Detective O'Sullivan entered the room, accompanied by an African-American male who was about 5 feet 10 inches, 170 pounds, with black and white hair, a mustache and eyeglasses. This man identified himself as a sergeant or lieutenant. The two policemen threatened defendant. The unnamed officer struck defendant in the stomach and the side of the neck with a blackjack. Defendant stated that he was handcuffed to the wall at this time. Defendant asked for an attorney.

The police left, but officers whom defendant could not identify returned about 30 minutes later. These officers took defendant to be fingerprinted. Defendant was then returned to the interview room at headquarters and handcuffed to the wall. Defendant had no food or sleep at this time. Detective Elzy entered the room to tell defendant he should confess because they had all the evidence they needed. Elzy

told defendant that Kim Bouchee was being held across the hall in another interview room. Defendant stated he did not want to talk; Elzy left the room.

Over the next eight hours or so, defendant was not given food, drink or an opportunity to use the washroom. Defendant stated that he had not been allowed to make a phone call. When defendant called out to Bouchee, Rickher came to the door and threatened that he would put his foot in defendant's mouth if defendant continued.

O'Sullivan, Elzy, Dahlberg and an unnamed officer then entered the room to inform defendant that Bouchee had taken a lie detector test and to tell defendant that he should take one. Defendant was told that Bouchee had failed the test and that defendant would be charged with murder if he failed the test also. Defendant declined to take the test, whereupon O'Sullivan hit defendant in the stomach and kneed him in the side.

Elzy then pushed O'Sullivan from the room. Elzy, an African-American, stated that he knew defendant did not want to speak with any of the white police officers. Elzy stated that he would see to it that no further harm would come to defendant if defendant gave a statement. At this time, two other unnamed police officers entered the room to show defendant items of clothing they had found at his apartment. These officers told defendant it was his last chance to confess and be charged with manslaughter.

Detective Dahlberg entered the room about an hour later. Defendant told Dahlberg that his arm hurt from being handcuffed to the wall; Dahlberg replied that if defendant wanted medical treatment, he would have to give a statement to the police. Defendant gave a statement implicating his brother in the homicide. Dahlberg stated that this was not the answer they wanted and hit defendant in the stomach.

At this point, Elzy entered the room. Defendant again complained about numbness in his arm from the handcuff. Elzy told defendant that they would provide drink, an opportunity to use the washroom and medical treatment if defendant gave a statement. Elzy told defendant that Bouchee was going to testify before a grand jury in the morning; if defendant waited to make a statement, he would be stuck by himself with the murder charge.

After Elzy left the room, defendant urinated on the floor while handcuffed to the wall. Another officer entered the room to ask defendant about other investigations for about 10 minutes. Other officers learned that defendant had urinated on the floor and beat the defendant. The floor was not cleaned.

Six or seven hours later, Detectives Elzy and O'Sullivan entered the room to ask for a statement. Defendant agreed, provided that the handcuffs be removed. Elzy guaranteed defendant a manslaughter charge if defendant gave a statement.

After giving a statement to the police, defendant was given coffee and cigarettes. The police phoned defendant's mother to tell her to bring new clothes to defendant. O'Sullivan and Elzy told defendant that when the assistant State's Attorney and court reporter arrived, he should not tell them of any mistreatment; otherwise, he would be beaten and the manslaughter deal would be off. He then spoke with the assistant State's Attorney and agreed to give the same statement to the court reporter.

On cross-examination, defendant admitted that he was 38 years old and had taken courses at the University of Alabama. Defendant also admitted that he had been arrested previously for attempted robbery, grand theft auto, armed robbery, attempted murder and for murder (three times). Defendant was found guilty of one murder and had pleaded guilty to another.

At the conclusion of the hearing, defendant's motion was denied. The trial court rejected defendant's testimony as unbelievable. The trial court also noted that defendant was familiar with the criminal justice system and even appeared to find the hearing itself amusing. The trial court described the period of detention as impermissibly long, but found that this factor did not invalidate defendant's statement.

JURY SELECTION

During *voir dire*, defendant requested a sidebar in which defendant presented an objection to the State's exclusion of African-Americans from the jury. Defendant noted that of the eight peremptory challenges exercised by the State, three were against African-American males. Defendant also noted that an Arab-American male had also been peremptorily challenged by the State. The trial court noted that the Arab-American "is not black," to which defendant responded that he would nevertheless be considered a minority in this country. Jury selection resumed without an express finding or ruling by the trial court.

Following *voir dire*, defendant renewed his objection and moved for a mistrial. The State accepted the trial court's computation that the State challenged seven white venirepeople and three African-Americans. The State maintained that defendant had not shown a *prima facie* case of discrimination, but explained its challenges for the

record. Defendant agreed that one of the African-Americans could be excluded on the basis of his criminal record. The State explained that during the sidebar regarding this first exclusion, Turman Brown, another African-American, looked at the State as if it were attacking another juror and appeared hostile. The State also noted that Brown had never been married and appeared effeminate, explaining that this was a consideration because defendant was homosexual. The State further noted that Brown worked for the Federal Department of Housing and Urban Development and that the management of HUD in Chicago had recently been scrutinized and appeared in the media. As for the third African-American, Tyrone Bunton, the State explained that Bunton worked for Illinois Bell and that the State did not like persons who worked for Illinois Bell. The State also noted that Bunton came from a large family and might be overly sympathetic in this case.

The trial court denied defendant's motion. The trial court stated that while the State believed that defendant had not laid a foundation for its objection, the trial court expressed the view that defendant need only show that the excluded persons were of the same background as defendant and similar to accepted venirepersons. The trial court went on to state that while the State's explanations were not strong, there was some substance to them and they were within the discretion of the attorneys. The trial court stated that it was sure the State was motivated with the best of intentions and accepted the explanations.

TRIAL

Following opening arguments, the State called Officer Clarence Murzyn as its first witness. Officer Murzyn testified that he received a call on July 14, 1985, which led him to the Grand-Ashland Hotel and the discovery of Musgrove's body, which had a knife protruding from the neck. Officer Murzyn identified photographs taken at the scene shortly thereafter.

Detective Blomstrand testified concerning his later investigation of the scene. Blomstrand gave testimony similar to that which he gave at the pretrial suppression hearing.[1] He also added that a length of pipe was also found near Musgrove's body.

---

[1]As noted earlier, Blomstrand testified at the suppression hearing that he observed the knife lying on Musgrove's shoulder. Murzyn testified that he observed the knife protruding from Musgrove's neck. However, these portions of the record are not questioned by defendant on appeal.

Evidence technician Michael McGuire testified that he and his partner photographed the scene and recovered various pieces of evidence, including the knife blade, the pipe and the door to room 211. McGuire later collected defendant's clothes and fingernail clippings at Area 4 headquarters.

Officer Garcia gave testimony similar to that which he gave at the pretrial suppression hearing. This testimony detailed the location and arrest of both Kim Bouchee and defendant.

Van Musgrove's mother, Ester Washington, testified as a life and death witness. She also testified that certain wristwatches had belonged to her son. The parties stipulated that Musgrove's father would give substantially identical testimony.

Detective Dahlberg testified regarding his contact with defendant during the time defendant was in custody at Area 4 headquarters. During their second conversation, defendant told Dahlberg that Kim Bouchee was defendant's "whore" and that "Che-Che" was Musgrove's "whore." Defendant told Dahlberg that he had last seen Musgrove four or five days before the discovery of the body, when defendant sought out Musgrove to raise bail money for Che-Che and spending money for the jail commissary.

Evidence technician Robert Dieringer testified that he further processed room 211, taking swab samples of apparent bloodstains on the wall and recovering other items with apparent bloodstains, including a chair and cloth from defendant's bed.

Detective O'Sullivan testified that room 211 was searched twice on July 17, 1985, after conversations with Bouchee and defendant. O'Sullivan recovered two watches which appeared to have dried blood on them. He identified these watches, which had been identified earlier by Ester Washington as having belonged to Musgrove. O'Sullivan also found items at a railroad embankment on July 17, 1985, including a bucket and a bag containing a bed sheet, men's pants, a shirt, a slip and a key ring with keys; many of these items appeared to have dried blood on them.

Officer Michael Zefeldt testified that microanalysis indicated that a hair on the door of room 211 was similar to Musgrove's hair. Pamela Fish, an employee of the Chicago Police Department Crime Laboratory, testified that analysis indicated that there was human blood on the floor near room 211, on the door to room 211 and the kitchen wall in room 211. Fish also testified that human blood found on the knife blade and the metal pipe was the same type as Musgrove's blood. The samples taken from the knife blade and the chair had eight of the same enzymes as Musgrove's blood. The samples

taken from the cloth on defendant's bed and from defendant's shoes were similar to Musgrove's blood in blood type, enzymes and hemoglobin type. Defendant's fingernail clippings indicated traces of blood, but there was an insufficient amount for detailed analysis.

Dr. Wuskel Konakci, a medical examiner, testified as to the cause of Musgrove's death. Dr. Konakci noted that Musgrove had 15 incised or cutting wounds, 14 stab or deep cutting wounds, 6 lacerations due to a blunt wound, internal bleeding and severe skull fractures such that the brain was partially exposed.

Assistant State's Attorney Jalaski testified as to his initial conversation with defendant and the statement defendant later gave in the presence of a court reporter. Jalaski then read this statement to the jury. In this statement, defendant stated that he and his brother, Lawrence "Little Man" Dorsey, met up with Musgrove on July 12, 1985, while in pursuit of bond money for Kim Bouchee. In the afternoon, defendant, Lawrence and Musgrove went back to room 211 at the Grand-Ashland Hotel. In room 211, the three men proceeded to "get high." Lawrence and Musgrove got into an argument; after separating the two, defendant hit Musgrove across both sides of the throat and across the Adam's apple with a butcher knife. As defendant stabbed Musgrove in the jaw and temple, Lawrence became hysterical, began vomiting and attempted to leave. Defendant pushed his brother down on the bed and told him that defendant would get him new clothes to exchange for the ones which had become bloody. Defendant estimated that he stabbed Musgrove between 10 and 20 times. Defendant explained that he had lost his temper.

Defendant identified an exhibit as the knife he had used to kill Musgrove. Defendant stated that he threw a sheet over Musgrove because "blood was gushing out like a water fountain over both walls." He then carried Musgrove to room 210. Musgrove was still gargling, so defendant found a pipe and beat Musgrove's skull 15 times. Defendant then cleaned the pipe with a rag, took two watches from Musgrove, wiped the door handle on the inside and outside, and locked room 210. Defendant wrapped the watches in the rag and hid them in a bottom dresser drawer in room 211. Defendant identified Musgrove's watches.

Defendant took his shirt, which was bloody, along with blue jeans, Lawrence's clothes, rags, Musgrove's keys—every item defendant observed blood upon—and put them in a bucket. Defendant later threw this paint bucket under a viaduct. Defendant identified exhibits as the bucket and items within it.

Defendant stated that Kim Bouchee was not present for these events because he was in jail on the charge of solicitation at that time. Defendant then stated that he took Lawrence somewhere on Madison to get drunk and later took Lawrence to their mother's house when Lawrence began to talk about the killing.

Defendant testified on his own behalf. This testimony was similar to the version of events presented in his written statement, except that defendant testified Lawrence had stabbed and beaten Musgrove in the course of their argument. In addition, a man named Edgar helped defendant take Lawrence from the bar on Madison to his mother's house. After leaving Lawrence, defendant and Edgar bailed Kim Bouchee out of jail with money defendant borrowed from his mother. The three men returned to room 211. Upon arriving, Bouchee asked defendant about bloodstains in the apartment. Defendant initially told Bouchee that he had gotten in a fight with a neighbor, but after Bouchee learned that this was untrue, he told Bouchee that Lawrence killed Musgrove. The two men cleaned the apartment, gathered the items they knew belonged to Musgrove and threw them from a viaduct at Laflin and Madison.

Defendant further testified that he gave the police a written statement inculpating himself to protect Lawrence. Defendant repeated his testimony from the suppression hearing regarding his detention and mistreatment at Area 4 headquarters.

The State called Sergeant Sykes, Detectives Elzy and O'Sullivan and Assistant State's Attorney Jalaski to rebut defendant's claims of abuse. Following closing arguments, the jury found defendant guilty of murder and armed robbery.

I

On appeal, defendant contends that the police lacked probable cause to arrest him. Probable cause for arrest exists where the totality of the circumstances known to the police officers at the time of arrest would lead a reasonably prudent person to believe that the suspect is committing or has committed a crime. The officer must have more than a mere suspicion of guilt, but need not have evidence sufficient to convict the suspect. This standard speaks to probabilities; the decision to arrest relies upon factual and practical considerations of everyday life upon which a reasonable, prudent person (rather than a legal technician) acts. Thus, a trial court's finding of probable cause will not be disturbed unless it is manifestly erroneous. See *People v. Cabrera* (1987), 116 Ill. 2d 474, 485-86, 508 N.E.2d 708, 712.

■ The record indicates that at the time of defendant's arrest, the police had defendant's general description and nickname, which is relevant to probable cause. (*People v. Key* (1984), 122 Ill. App. 3d 491, 495, 461 N.E.2d 517, 520.) The proximity of defendant's apartment to the scene of the crime is also relevant. (*People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 434, 505 N.E.2d 1228, 1232; *People v. Gutknecht* (1984), 121 Ill. App. 3d 839, 843, 460 N.E.2d 60, 63.) The police viewed apparent blood on the interior of defendant's doorway and on defendant's shoes. (See *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 400, 495 N.E.2d 984, 989.) Although not as strong as the evidence of a fight in *People v. Williams* (1985), 137 Ill. App. 3d 736, 742, 484 N.E.2d 1191, 1196, the police believed that the victim had recently quarrelled with defendant and Bouchee. The police were told that defendant quickly left the hotel upon hearing that Collins was going to call the police. (*Cf. Pietryzk*, 153 Ill. App. 3d at 434, 505 N.E.2d at 1232 (furtive conduct or flight from police is relevant).) Ceasar Grant had told the police that the victim had no visitors recently. Collins told the police that "Prince" had told her he had previously killed four people and was just released from jail on a murder conviction; information that defendant had committed a similar offense may be relevant. (*Cf. People v. Eddmonds* (1984), 101 Ill. 2d 44, 60, 461 N.E.2d 347, 355 (murder victim appeared to have been sexually molested and suspect was known to be a previous sex offender).) Finally, it was relevant that the nature of the offense was both violent and serious. (See *Stachelek*, 145 Ill. App. 3d at 400, 495 N.E.2d at 989.) Although information known to the police at the time of defendant's arrest also implicated Bouchee, the facts support the trial court's finding of probable cause as to defendant.

II

Defendant also argues that his statement should have been suppressed as the involuntary product of a lengthy confinement in the interview room at Area 4 headquarters. Whether a statement is made voluntarily is judged by the totality of the circumstances, which may include: the age, education and intelligence of the accused; the accused's prior experience, if any, with the criminal justice system; the duration of both the detention and the interrogations; whether the accused was advised of his constitutional rights; and whether defendant was subjected to physical mistreatment or abuse. (See *People v. House* (1990), 141 Ill. 2d 323, 376, 566 N.E.2d 259, 282-83; *People v. Terrell* (1989), 132 Ill. 2d 178, 198, 547 N.E.2d 145, 153.) If the police conduct was inherently coercive, however, the trial court need not exam-

ine the traits of the individual defendant. (See, *e.g.*, *Ashcraft v. Tennessee* (1944), 322 U.S. 143, 88 L. Ed. 1192, 64 S. Ct. 921.) The trial court determines whether the statement was voluntary by a preponderance of the evidence; such a finding will not be reversed unless it is against the manifest weight of the evidence. (*House*, 141 Ill. 2d at 376, 566 N.E.2d at 283.) As the trial court resolved the conflicting testimony against defendant, this court will analyze the issue using the testimony of the State's witnesses and the uncontroverted testimony of the defendant. *House*, 141 Ill. 2d at 370, 566 N.E.2d at 280.

■ Adopting this approach, we accept that defendant was given food, drink and opportunities to use the washroom facilities. Although defendant's pants and shirt were taken for scientific analysis, defendant was provided with a paper gown to wear until the police had defendant's mother bring new clothes to the station. We accept that defendant was not physically abused by the police. The police did not prevent defendant from sleeping in the interview room, though the room would not promote sleep. Thus, the crux of the issue is whether the length of detention and interrogation in the interview room was inherently coercive.

Defendant contends that he gave his statement only after being detained for 63 hours in a 12-foot-square, windowless room with only a table and chair. Defendant appears to arrive at this figure by calculating from the time he was first placed in the room to what defendant labels the seventh interrogation. It should be noted, however, that the record indicates that defendant agreed to give a statement during what defendant calls the sixth interrogation, which would be between 57 and 60 hours after the arrest. It should also be noted that defendant was removed from the interview room and taken for booking in the early morning hours of July 15, arguably reducing the time that defendant was held continuously in the interview room before agreeing to make a statement to 51 hours. Our analysis, however, does not depend on which figure is chosen.

Defendant refers to eight police interrogations during his detention. Calculating the duration of all the alleged interrogations identified by defendant, using the times indicated in the record, indicates that defendant was questioned for about four hours before giving a written inculpatory statement.

Our supreme court has condemned the police practice of detaining suspects in an interview room without basic facilities for extended periods of time. (*House*, 141 Ill. 2d at 378, 566 N.E.2d at 283.) The record indicates that the police station in *House*, located at Harrison and Kedzie (*House*, 141 Ill. 2d at 334, 566 N.E.2d at 263), is the same

location involved in this case. The *House* court warned the police against "brinksmanship" in upholding a finding that statements given after 25 and 37 hours in an interview room were voluntary. *House,* 141 Ill. 2d at 379-80, 566 N.E.2d at 284.

On the other hand, the *House* decision was not handed down until more than four years after defendant's arrest in this case, which precludes us from imputing knowledge of this condemnation to the police. Moreover, the *House* court indicated drawing a bright line in this type of case would be unworkable. (*House,* 141 Ill. 2d at 379, 566 N.E.2d at 284.) The *House* court's application of the totality-of-the-circumstances standard leads us to conclude that this particular factual matrix does not lend itself to a determination of inherent coercion.

In addition, this court has previously held that statements given after more than 37 hours of detention may be voluntary under somewhat similar circumstances. (See *People v. Matthews* (1990), 205 Ill. App. 3d 371, 406, 562 N.E.2d 1113, 1133; see also *People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140.) We note that in *Matthews* and *Williams,* the defendant was placed in a lockup when not under questioning, which did not occur in this case. On the other hand, "[a] jail cell is hardly a paradise for the senses" either. *House,* 141 Ill. 2d at 379, 566 N.E.2d at 284.

Furthermore, the precedent of the United States Supreme Court leads us to conclude that the trial court did not err in finding defendant's statement was voluntary. As a treatise cited in *House* indicates, "where the detention has been only a few days or the questioning lasted only a few hours, exclusion of the confession has typically occurred only when it was also shown that the defendant was especially susceptible to coercion." (1 W. LaFave & J. Israel, Criminal Procedure §6.2(c), at 445 (1985).) For example, in *Culombe v. Connecticut* (1961), 367 U.S. 568, 621-35, 6 L. Ed. 2d 1037, 1068-76, 81 S. Ct. 1860, 1889-96, the Court noted that Culombe was mentally defective and likened his case to that of *Fikes v. Alabama* (1957), 352 U.S. 191, 1 L. Ed. 2d 246, 77 S. Ct. 281, in which the defendant had a third-grade education, was apparently schizophrenic and highly susceptible to suggestion. The Court distinguished *Culombe* from *Brown v. Allen* (1953), 344 U.S. 443, 97 L. Ed. 469, 73 S. Ct. 397, where the defendant did not have such attributes and the questioning was sporadic, even though the defendant was detained for five days. See *Culombe,* 367 U.S. at 626-27 & n.89, 6 L. Ed. 2d at 1071-72 & n.89, 81 S. Ct. at 1892 & n.89; *Brown,* 344 U.S. at 475-76, 97 L. Ed. at 498-99, 73 S. Ct. at 416-17.

The record shows that defendant was an educated adult. The State's witnesses testified that defendant was fully advised of his constitutional rights. The record also shows that defendant also was aware of his constitutional rights from prior, extensive contacts with the criminal justice system, allowing the inference that defendant was aware of the consequences of making an inculpatory statement. (*Terrell*, 132 Ill. 2d at 198, 547 N.E.2d at 153.) Thus, we conclude that the finding of voluntariness was not manifestly erroneous.

In the alternative, defendant argues that his detention resulted in a 63-hour delay in presenting him to a magistrate, in violation of his State statutory and fourth amendment rights to a prompt determination of probable cause. (See U.S. Const., amend. IV; Ill. Rev. Stat. 1985, ch. 38, par. 109—1(a).) After a warrantless arrest, the State must provide defendant with a prompt determination of probable cause by a neutral, detached magistrate. (*Gerstein v. Pugh* (1975), 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854.) Providing this determination of probable cause within 48 hours generally satisfies this constitutional requirement. (See *County of Riverside v. McLaughlin* (1991), 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670.) Beyond 48 hours, the burden shifts to the State to show extraordinary circumstances justifying the delay. (See *County of Riverside*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.) However, failure to promptly present defendant before a magistrate does not invalidate a confession *per se*, but is merely a factor to consider in determining the voluntariness of a statement. *House*, 141 Ill. 2d at 380, 566 N.E.2d at 284.

In its brief, the State argues that "the scientific analysis could not be processed within 48 hours and some of the evidence was not found at the time of defendant's arrest and processing therefore could not begin until later than the arrest. The results of the analyses were important to the charging and questioning of the defendant." The Supreme Court, however, has specifically noted that delaying presentment to gather more evidence to support an arrest is an example of *unreasonable* delay. (*County of Riverside*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.) Defendant argues that he would have invoked his fifth and sixth amendment rights at the presentment, precluding further questioning. Yet, as noted above, the record indicates that defendant was aware of his sixth amendment right to counsel and fifth amendment privilege against self-incrimination and invoked neither during his detention. Thus, despite a seemingly unreasonable delay in presentment, defendant has failed to show any prejudice resulting from it. *House*, 141 Ill. 2d at 380-81, 566 N.E.2d at 285.

## III

■ Defendant next contends that the trial court should have suppressed his statements because the State failed to produce Detectives Mientus and Elzy as witnesses. When the voluntariness of a statement is challenged, the State must produce all material witnesses connected with the statement or explain their absence. (*People v. Watson* (1989), 178 Ill. App. 3d 796, 807, 533 N.E.2d 1011, 1018.) Defendant failed to specify this alleged error in his motion for a new trial, thus waiving the issue. (*People v. Sargent* (1989), 184 Ill. App. 3d 1016, 1021-22, 540 N.E.2d 981, 984-85; *People v. Nunez* (1974), 24 Ill. App. 3d 163, 169-70, 320 N.E.2d 462, 467.) This court, however, may review the issue for plain error. *E.g., People v. Ralon* (1991), 211 Ill. App. 3d 927, 950, 570 N.E.2d 742, 758.

The record indicates that Elzy was a rebuttal witness at the hearing on the motion to suppress statements. Defendant's brief does not indicate that prejudice resulted from the State's failure to produce Elzy during its case in chief. Defendant has seemingly failed to show plain error in this regard.

The record indicates that Mientus did not testify at this hearing. Yet the record also indicates that Mientus did not question defendant alone in the interview room; rather, Mientus was always with Elzy, Sykes or O'Sullivan. Defendant's brief does not indicate that Mientus' testimony would have differed materially from that of Elzy, Sykes and O'Sullivan, all of whom testified that defendant was well treated while in custody. Thus, even if this court were to assume *arguendo* that Mientus was a material witness, defendant has failed to show plain error. *Ralon*, 211 Ill. App. 3d at 951, 570 N.E.2d at 758.

## IV

■ Defendant next argues that the State purposefully discriminated against African-Americans during jury selection, in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Under *Batson* and its progeny, a defendant must establish a *prima facie* case of purposeful racial discrimination by showing that the State exercised its peremptory challenges to remove members of a cognizable racial group from the venire. (See *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) In this case, the record indicates that the State did not believe that defendant had made a *prima facie* case, but nevertheless offered explanations for its peremptory challenges. The trial court ruled on the ultimate question of intentional discrimination; the record does not indicate that the trial

court specifically ruled regarding the *prima facie* case. Thus, the issue of whether defendant made a *prima facie* showing is moot. *Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859.

Thus, the burden shifts to the State to come forward with clear, reasonably specific, legitimate and race-neutral explanations for striking the venirepersons. (See *Batson,* 476 U.S. at 93-94, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) These explanations need not rise to the level justifying a challenge for cause, but a mere assertion of good faith or nondiscriminatory motive is insufficient. (*People v. Harris* (1989), 129 Ill. 2d 123, 174, 544 N.E.2d 357, 379.) The trial court must make a sincere, reasoned assessment of the genuineness of the State's explanations. (*People v. Baisten* (1990), 203 Ill. App. 3d 64, 77, 560 N.E.2d 1060, 1068.) Whether a *prima facie* case has been rebutted is a factual question grounded in credibility; thus, the trial court's decision will not be reversed unless it is against the manifest weight of the evidence. (*Harris,* 129 Ill. 2d at 175, 544 N.E.2d at 380.) The exclusion of even one venireperson on the basis of race requires reversal of defendant's conviction. (*People v. McDonald* (1988), 125 Ill. 2d 182, 200, 530 N.E.2d 1351, 1359.) Therefore, the explanations for peremptorily excluding each African-American venireperson will be reviewed. (*People v. Kindelan* (1991), 213 Ill. App. 3d 548, 555, 572 N.E.2d 1138, 1142.) On appeal, defendant objects to two challenges; we address each in turn.

*Turman Brown*—The State volunteered that Brown had looked at the prosecutor with hostility during a sidebar regarding a prior peremptory challenge. The State also noted that Brown appeared effeminate and implied that he might sympathize with the defendant. Explanations that focus on a person's demeanor must be closely scrutinized to insure they are not a pretext for discrimination. (*Harris,* 129 Ill. 2d at 176, 544 N.E.2d at 380.) Nevertheless, given the great deference accorded to the trial court's assessment of the State's credibility, we cannot say that the ruling was clearly in error.

*Tyrone Bunton*—The State volunteered that Bunton's employment with Illinois Bell was undesirable for a juror and that Bunton also came from a large family, with 12 brothers and sisters, which might make him sympathetic to defendant. At this point in the proceedings, the trial court and the State had heard defendant testify (at the motion to suppress statements) that he inculpated himself to protect his brother. The State added at the hearing on defendant's motion for new trial that the State believed siblings tend to help raise each other more in large families than in small families, creating a stronger fa-

milial bond. Given this record, it seems that the court's finding of no intentional discrimination was not clearly erroneous.

Defendant argues that the trial court was required to make specific findings as to each excluded venireperson, but stated only that "the State seems to connect, at least, some of their challenges to the facts in this case." However, the cases cited by defendant generally do not support this argument; rather, they refer to this court's duty to examine the reasons offered for each exclusion. *Harris*, on appeal following a *Batson* remand, faulted the trial court for failing to make findings as to an excluded venireperson because the court believed it lacked sufficient information for review. The *Harris* court also distinguished *People v. Mack* (1989), 128 Ill. 2d 231, 538 N.E.2d 1107, where the trial court found that the facts were not in dispute and that all of the State's reasons were legitimate. (*Harris*, 129 Ill. 2d at 187-88, 544 N.E.2d at 385-86.) In this case, the trial court did not explicitly find that the facts were not in dispute; on the other hand, defendant has not disputed any of the underlying facts on appeal. Moreover, the record on this issue, when read in its entirety, indicates that the trial court accepted the State's explanations. Thus, the record is sufficient for review.

Defendant also suggests that the trial court merely accepted the State's assertion of good intent. The record, however, indicates that the State did not assert good intent; rather, the trial court *concluded* that the State was acting with the best of intentions, a conclusion that is entitled to deference on appeal.

■ Defendant further contends that the trial court erred in ruling that defendant lacked standing to challenge the State's exclusion of an Arab-American. Under *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364, defendant had third-party standing to challenge such an exclusion. The record indicates that defendant objected to this exclusion, that the trial court responded that the venireperson was not an African-American, and that defendant nevertheless registered his objection. Defendant did not actually obtain a ruling at that time. Defendant failed to reassert the objection either during the motion for mistrial which followed *voir dire* or in his written motion for a new trial. Consequently, defendant has waived the objection to this exclusion.

## V

■ Defendant's fifth argument is that the trial court erred by admitting into evidence a photograph of the victim, whose wounds were allegedly made to look more gruesome by the autopsy procedure and

by the presence of maggots in the picture. Turning first to the alleged autopsic incisions, we note that defendant's citations to the record do not contain objections to autopsy incisions. Moreover, the error is not specified in defendant's motion for a new trial, resulting in waiver. *People v. Nevitt* (1990), 135 Ill. 2d 423, 441, 553 N.E.2d 368, 374.

Turning next to the alleged maggots, it must be noted that the decision to admit a photograph is generally within the discretion of the trial court, unless its prejudicial impact would outweigh its probative value. (See *People v. Henderson* (1990), 142 Ill. 2d 258, 319, 568 N.E.2d 1234, 1263-64.) Defendant has failed to identify or include the photograph at issue in the record on appeal. Thus, we are unable to determine whether there was an abuse of discretion. *People v. Turner* (1989), 128 Ill. 2d 540, 566, 539 N.E.2d 1196, 1207.

## VI

■ Defendant next argues that the trial court unduly restricted his ability to cross-examine witnesses on the issue of whether his confession was voluntary. Defendant identifies a number of instances where the trial court sustained the State's objections to various questions asked by defendant on cross-examination. Defendant's motion for new trial, however, only refers to: (1) the cross-examination of Detective O'Sullivan as to the contents of conversations between O'Sullivan and defendant while defendant was in custody during the State's case in chief; and (2) the cross-examination of O'Sullivan and Elzy after rebuttal testimony that they did not coerce defendant into making a statement. Any other objections are waived on appeal. *People v. Chevalier* (1989), 131 Ill. 2d 66, 77, 544 N.E.2d 942, 946.

Even if none of these objections were waived, defendant's argument is not persuasive. The trial court's decisions regarding the scope of cross-examination will not be reversed absent an abuse of discretion resulting in prejudice to defendant. (*People v. Owens* (1984), 102 Ill. 2d 88, 103, 464 N.E.2d 261, 268.) Even so, defendant's right to cross-examine witnesses is essential to his right to confront witnesses against him; thus, limitations thereon require scrutiny. *People v. Rutledge* (1985), 135 Ill. App. 3d 259, 262, 481 N.E.2d 348, 350.

The record indicates that the objections sustained by the trial court and complained of on appeal fall into two categories: (1) questions beyond the scope of direct examination; and (2) questions calling for facts beyond a witness' personal knowledge. Such limitations on cross-examination do not violate defendant's right to

cross-examination. *People v. Dortch* (1982), 109 Ill. App. 3d 761, 767, 441 N.E.2d 100, 105.

Defendant relies upon *Crane v. Kentucky* (1986), 476 U.S. 683, 90 L. Ed. 2d 636, 106 S. Ct. 2142, in which the defendant was completely precluded from presenting testimony that he was detained in a small, windowless room until he confessed. Unlike *Crane*, however, defendant in this case was not completely precluded from introducing favorable evidence or disputing unfavorable evidence; rather, he was precluded from doing so on some topics in the context of cross-examination. (See *People v. Richardson* (1988), 123 Ill. 2d 322, 345, 528 N.E.2d 612, 620.) Defendant has failed to show that the trial court erred in sustaining the objections.

## VII

■ Defendant's seventh argument is that the trial court erred by allowing the State to use defendant's prior murder conviction for impeachment without limiting the State to referring to it only as a prior felony conviction. A trial court may, in its discretion, exclude evidence of a prior felony conviction when the prejudicial effect of admitting it outweighs its probative value. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) Factors to consider in making this ruling include: (1) the nature of the prior crime; (2) the proximity in time of the prior crime; (3) the similarity of the prior crime to the current charge; and (4) the subsequent career of the defendant. (*People v. Siebert* (1979), 72 Ill. App. 3d 895, 902, 390 N.E.2d 1322, 1328.) The trial court also may limit the State to referring to the conviction as a felony without specifying the crime. (*Williams*, 137 Ill. App. 3d at 743, 484 N.E.2d at 1197.) The trial court may be reversed where its comments indicate that it failed to exercise its discretion. *People v. Smith* (1979), 73 Ill. App. 3d 577, 579, 392 N.E.2d 347, 349.

In this case, the trial judge stated that "I don't think I have any right to deny [the State] the right to present evidence." The record, however, also indicates that the trial court was aware of *Montgomery*, permitting the presumption that the trial court gave proper consideration to the relevant factors. (*Siebert*, 72 Ill. App. 3d at 902, 390 N.E.2d at 1328.) As the record also indicates that the trial court was aware it could limit the use of the conviction under *Williams*, it appears that the trial court exercised its discretion.

Defendant also cites *Siebert* to argue that the trial court erred because the prior murder conviction was not indicative of dishon-

esty and was similar to the crime for which defendant was being tried. The *Siebert* court held that a prior conviction should have been excluded because the similarity and proximity of the crimes would have inevitably suggested that defendant had a propensity to commit this type of crime. (*Siebert*, 72 Ill. App. 3d at 903, 390 N.E.2d at 1329; see also *People v. Wright* (1977), 51 Ill. App. 3d 461, 463-64, 366 N.E.2d 1058, 1061 (trial court's comments indicated that the basis for the ruling was to prove propensity).) In this case, the prior crime was far more remote in time and the trial court's comments do not indicate that the conviction was admitted to prove propensity. Thus, defendant has not shown that the trial court erred, given the record on appeal.

## VIII

Finally, defendant contends that he was deprived of a fair trial due to improper comments made by the State during closing arguments. This court has held the exact allegation appearing in defendant's post-trial motion to be too vague to preserve the issue for review. (*Sargent*, 184 Ill. App. 3d at 1021-22, 540 N.E.2d at 986-87.) Even if this court were to assume *arguendo* the issue had not been waived and that some or all of the comments identified by defendant were improper, they may be deemed harmless error where the evidence of defendant's guilt is overwhelming and the jury was instructed not to consider closing arguments as evidence. (See *People v. Faysom* (1985), 131 Ill. App. 3d 517, 525, 475 N.E.2d 945, 952.) The record indicates that this is such a case.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'CONNOR and MANNING, JJ., concur.